# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 50385 | **DATE** | 7/12/2002 |
| **CASE TITLE** | | BELL vs. BARNHART | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  For the reasons stated in the attached, this court finds that the ALJ's findings at each step of the sequential analysis are supported by substantial evidence. Therefore, Plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is granted. Enter attached Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | **JUL 15 2002** | | 15 |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | U.S. DISTRICT COURT | docketing deputy initials | |
| | Mail AO 450 form. | | CLERK | 7/12/2002 | |
| | Copy to judge/magistrate judge. | | 02 JUL 12 PM 3: 14 | date mailed notice | |
| tml | courtroom deputy's initials | | FILED-WD | gg | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| NANCY C. BELL, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 01 C 50385 |
| | ) | |
| v. | ) | Philip G. Reinhard |
| | ) | P. Michael Mahoney |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, (Plaintiff), seeks judicial review of the final decision of the Commissioner of the

Social Security Administration (Commissioner). See 42 U.S.C. §§ 405(g), 1383(c)(3). The

Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits (DIB)

pursuant to Title XVI of the Social Security Act (the Act). 42 U.S.C. §1381(a). This matter is

before the Magistrate Judge pursuant to consents filed by both parties on January 25, 2002. See 28

U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I.    BACKGROUND

Plaintiff filed for DIB on June 30, 1998, alleging disability beginning on August 28, 1990.

(Tr. 104-107). Plaintiff's last insured date is December 31, 1994, and Plaintiff must therefore

establish disability on or before that date. (Tr. 11). Plaintiff's application for benefits was denied

on August 20, 1998. (Tr. 77-80). On October 19, 1998, Plaintiff filed a request for reconsideration.

(Tr. 81). Plaintiff's request for reconsideration was denied on November 17, 1998. (Tr. 82-84).

Plaintiff then filed a request for a hearing before an Administrative Law Judge (ALJ) on December

17, 1998. (Tr. 85). Plaintiff appeared, with counsel, before an ALJ on July 7, 1999. (Tr. 16-74). In a decision dated October 29, 1999, the ALJ found that Plaintiff was not entitled to DIB. (Tr. 8-15). On December 14, 1999, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 6-7). On August 22, 2001, the Appeals Council denied Plaintiff's request for review. (Tr. 4-5).

## II.  **HEARING TESTIMONY**

Plaintiff was born on October 28, 1948, and was 50 years old at the time of the hearing. (Tr. 104). Plaintiff alleged disability, beginning on August 28, 1990, due to blood clots in left leg and pelvis and deteriorating valves in leg. (Tr. 104). Plaintiff testified that she currently resides in a house in Belvidere, Illinois with her husband. (Tr. 21-22). Plaintiff testified that she completed school through her freshman year and never obtained a GED. (Tr. 23). Plaintiff stated that she was in special classes and that she had difficulty in high school but is able to read and write. (Tr. 24). After quitting school she worked in a private nursing home. (Tr. 23-24). As to her work history, Plaintiff stated that it has been years since she worked at a job that lasted more than three months. (Tr. 26). Plaintiff stated that she has helped her husband with his cleaning business, she worked part-time refilling vending machines, she worked as a janitor at the Belvidere courthouse, she worked part-time as a security guard, and she worked as an aide in different nursing homes. (Tr. 26-32). Plaintiff stated that she cannot work now because she has pain and swelling in her legs. (Tr. 34). Plaintiff worked for four weeks in 1997 at a nursing home in Belvidere and testified that she would come home after work with back pain and her leg swollen. (Tr. 44). Plaintiff stated that she attempted to work at several jobs through a temporary agency but experienced back pain and swelling in her leg and was unable to continue working. (Tr. 44-46). Plaintiff stated that she applied for benefits in 1990 and received a decision through the mail that she did not appeal. (Tr. 36).

2

Plaintiff testified that since 1990, her condition has worsened. (Tr. 40). Plaintiff stated that she began seeing Dr. Valaitis, a cardiologist, in 1982. (Tr. 41). According to Plaintiff, Dr. Valaitis has always recommended that she work no more than four hours a day and Plaintiff states that she has worked the four hours, and sometimes more, and that is why she is in the shape she is in now. (Tr. 42). Plaintiff also sees Dr. Malakar as her family physician and he has been treating her back injury. (Tr. 46). Plaintiff stated that her spine was injured in an automobile accident and that she has had neck and lower back problems as a result of the accident. (Tr. 47). Plaintiff testified that she has had the back and neck problems since 1972 and currently takes two Vicodin a day for pain associated with those problems. (Tr. 48). Plaintiff stated that she is also currently taking Flexiril, Tylenol 3, Paxil, Allegra, Lextra, and Coumadin. (Tr. 48-49). Plaintiff stated that the Flexiril is for her back and also for female problems, the Tylenol 3 she takes on and off as it is habit forming, Allegra is for her allergies, Lextra is a water pill, and she has taken the Coumadin since 1980 for phlebitis. (Tr. 49). Plaintiff also testified that she has been taking Paxil for depression since 1993. (Tr. 50). Plaintiff reported that she takes the Lextra when she experiences swelling in her leg and that she reclines until the swelling recedes. (Tr. 51).

As to her daily activities, Plaintiff stated that she gets up between 8:30 and 9:00 in the morning, has breakfast, does some chores at her own pace, sits in the yard, fixes dinner, and then watches TV or sits outside with her husband. (Tr. 51). Plaintiff stated that she has a very hard time sleeping at night. (Tr. 51). Plaintiff stated that her husband helps with the heavier chores and that she has outside help to do the heavy cleaning every month or so. (Tr. 52). Plaintiff reported that she sits in a recliner as often as she can to elevate her feet and that sometimes her leg still swells. (Tr. 54). Plaintiff testified that she had been very active prior to her illness and that she is unable to do

3

any of the activities, sports, dancing, and traveling, that she used to be able to do. (Tr. 53-54). Plaintiff reported that Dr. Valaitis has recommended that she not travel by car for more than an hour or an hour and a half and that she should get out and walk around whenever possible. (Tr. 56). Plaintiff testified that she has had Foley stockings to wear since 1982, but that she did not always wear them because they are uncomfortable and caused female problems. (Tr. 55). Plaintiff stated that she does have a new type of stocking that she only wears on her left leg but that it is uncomfortable and expensive. (Tr. 55).

In response to questions from the ALJ, Plaintiff stated that she just bought three pair of new stockings in February or March and that she gets new ones every year but that the insurance company will only pay so much. (Tr. 57). Plaintiff testified that she does smoke between half a pack and a pack of cigarettes a day. (Tr. 57). As to her work for her husband's cleaning business, Plaintiff stated that she worked about six hours each week doing bookkeeping. (Tr. 57-58). The ALJ asked Plaintiff about a note from a Dr. Kikta that identified Plaintiff as the proprietor of the business. (Tr. 58). Plaintiff replied that she just did some of the bookwork. (Tr. 58).

Plaintiff's husband, Mr. Richard Bell, also testified on behalf of Plaintiff before the ALJ. (Tr. 60-67). Mr. Bell stated that he had started his cleaning business as an attempt to find something Plaintiff could work at and to supplement their income. (Tr. 62). Mr. Bell testified that Plaintiff worked mainly at soliciting customers and building the business and that after 1993 or 1994 she was unable to help much at all and he let the business dwindle. (Tr. 63-64). Mr. Bell stated that, currently, the business has had only one customer for the last three to five years. (Tr. 54). Mr. Bell testified that when they first started the business, Plaintiff was participating in it for fifteen to twenty hours each week and that by 1994 and 1995 Plaintiff was only doing estimating and looking at some

4

of the paperwork. (Tr. 66).

The ALJ then questioned Ms. Susan Entenberg, a vocational expert. (Tr. 68-72). Ms. Entenberg testified that she had previously reviewed the exhibits provided and had heard the testimony presented at the hearing. (Tr. 68). Ms. Entenberg testified that, based upon Plaintiff's testimony and the records produced, Plaintiff's previous work was unskilled and that the work as a nursing aid was heavy, the work as a machine operator, gas station clerk, sorter, janitor, and vending machine filler were light, and the work as a gate guard was sedentary. (Tr. 68-69). The ALJ asked whether an individual of Plaintiff's age, with a ninth grade education, the work experience identified, who can lift up to twenty pounds occasionally and ten pounds frequently, who can stand, sit, or walk as required, but has to put her feet up for fifteen to twenty minutes every three to four hours, and cannot work with concentrated pulmonary irritants can perform any work. (Tr. 69). Given that hypothetical, Ms. Entenberg stated that such an individual would be able to perform her past relevant work, except for the work as a nurse's aide and janitor. (Tr. 69). Ms. Entenberg testified that if the requirement for a sit/stand option allowing the individual to shift positions every hour were added, the individual would still be able to do the gate guard job. (Tr. 69). The ALJ then asked if any jobs would remain if the individual were required to elevate her leg for fifteen to thirty minutes twice each day. (Tr. 70). Ms. Entenberg replied that if the person were required to elevate her leg above her heart for up to an hour during the work day, then no jobs would remain that the individual could perform. (Tr. 70). Ms. Entenberg stated that if the person were required to elevate her leg only six inches or so then it wouldn't affect the job. (Tr. 70). Ms. Entenberg also testified that if the individual were also unable to work in extreme temperatures, that would not affect her ability to perform the gate guard, gas station clerk, machine operator, and vending jobs. (Tr. 70).

5

## III.    **MEDICAL HISTORY**

Plaintiff was admitted to St. Anthony Hospital on February 21, 1981 and again on March 5, 1981, with complaints of left leg pain and swelling. (Tr. 216-222). Venography of Plaintiff's left leg demonstrated thrombophlebitis. (Tr. 216). Plaintiff was started on Heparin and fitted for a compression stocking.

Plaintiff was seen July 22-26, 1982 by Dr. Bruce Kottke, MD, a cardiologist at the Mayo Clinic. (Tr. 184-185). Dr. Kottke indicated that Plaintiff had suffered a single incident of post-operative thrombophlebitis and suffers from muscle tension distress in her legs. (Tr. 184). Dr. Kottke reported that all laboratory studies were normal and the vascular studies indicated minimal evidence of deep venous insufficiency. (Tr. 184). Dr. Kottke indicated that Plaintiff's symptoms were likely due to muscle tension and that she does have a mild form of chronic venous insufficiency and should use elastic support if swelling becomes a problem. (Tr. 184). Dr. Kottke arranged for Plaintiff to be instructed in a program of leg exercises, noted that she did not need anti-coagulants, and reported that there was no necessity for limitations on her activity. (Tr. 184-185).

Rockford Memorial Hospital records indicate that Plaintiff was admitted October 30, 1986, through November 8, 1986, for recurrent deep vein thrombosis in her left leg. (Tr. 206-209). The report indicated that Plaintiff had a history of thrombophlebitis with the first occurrence in 1981 after a hysterectomy. (Tr. 206). Plaintiff was treated with Coumadin for a year following that episode and had a reoccurrence in 1983 and was again treated with Coumadin, for a shorter period of time. (Tr. 206). Doppler studies revealed deep vein thrombosis superimposed on previous disease, because of valvular incompetence. (Tr. 206). After the swelling receded, Plaintiff was fitted with a thigh-high compression stocking and was discharged on Coumadin. (Tr. 206).

Plaintiff's phlebitis was treated primarily by Dr. Valaitis, MD. On October 6, 1987, Plaintiff

reported that she was working cleaning the courthouse in Belvidere and cleaning houses and had not

been wearing her support stockings in the warm summer months. (Tr. 199). Dr. Valaitis indicated

that he allowed Plaintiff to continue working because it was a new job but that she should put the

stockings on as soon as the swelling recedes and that she would have to be off work completely if

her leg did not improve. (Tr. 199). Plaintiff reported an episode of swelling on November 10, 1987,

and Dr. Valaitis noted significant swelling even with the support stocking. (Tr. 198). Plaintiff was

advised to stay off her feet completely for a week and to be up for no more than three to sixteen

minutes at a time during the second week. (Tr. 198). After two weeks, Dr. Valaitis indicated that

Plaintiff could return to work and should wear her support stocking and get off her feet for fifteen

to twenty minutes every three to four hours. (Tr. 198). On November 29, 1988, Plaintiff was seen

by Dr. Valaitis for a burning discomfort and swelling in her left leg. (Tr. 195). Dr. Valaitis advised

Plaitniff to remain off her leg for 72 hours and after that to make a point of elevating her feet for

twenty minutes four times a day. (Tr. 195). Dr. Valaitis noted in June 1989 that Plaintiff was moving

to Texas and in July 1990, Dr. Valaitis noted that Plaintiff had returned to Belvidere. (Tr. 193).

Plaintiff reported that she would like to return to work and Dr. Valaitis indicated that he had no

objections to her returning to work, but that she should wear her support stockings. (Tr. 193). In

January 1991, Dr. Valaitis noted that Plaintiff was experiencing some swelling in her left leg and had

not been wearing her support hose. (Tr. 192). Plaintiff reported that she was back to running her

own cleaning business but was doing more supervising and less work on her feet. (Tr. 193). On

March 7, 1991, Dr. Valaitis noted that Plaintiff had been recently hospitalized for a reoccurrence of

phlebitis. (Tr. 191, 267-268). Plaintiff reported that she had been on her feet quite a bit and had not

been wearing her support stockings. (Tr. 191). On June 8, 1993, Dr. Valaitis reported that Plaintiff's left leg had a little swelling and superficial varicosities and that she was not wearing support stockings. (Tr. 147). On May 16, 1994, Plaintiff had less swelling and discomfort in her left leg. (Tr. 148). Dr. Valaitis noted that Plaintiff was not wearing her support stocking the way she should and was not getting off her feet several times a day as advised. (Tr. 148). Plaintiff expressed some concern about her cardiovascular health and possible blood clots in her leg and Dr. Valaitis recommended that Plaintiff stop smoking and scheduled her for a venous doppler in her leg. (Tr. 148). The venous doppler showed no evidence of acute deep venous thrombosis - evidence of old disease was demonstrated and there was reflux within the common femoral and superficial femoral veins and reflux in the deep system compatible with chronic venous insufficiency. (Tr. 154). On October 17, 1994, Plaintiff was seen for complaints of swelling and discomfort in her left leg. (Tr. 149). Plaintiff had not been wearing her support stocking and Dr. Valaitis noted quite a bit of swelling and superficial varicosities in Plaintiff's left leg. (Tr. 149). Dr. Valaitis reported that Plaintiff continued to have problems with chronic venous insufficiency and thrombophlebitis, sent Plaintiff to be fitted for Greer stockings and recommended that she get off her feet for fifteen to twenty minutes three to four times a day. (Tr. 149). On February 20, 1996, Plaintiff again had swelling and discomfort in her left leg and Dr. Valaitis noted that she had not been wearing her support stocking and reported forgetting to take her Coumadin on occasion. (Tr. 150). Dr. Valaitis also noted that Plaintiff reported that she would be getting an epidural block for her low back and Dr. Valaitis advised her that she would have to be off the Coumadin for four days prior to the procedure and would have to be off her feet during that time. (Tr. 150). On October 1, 1996, Dr. Valaitis noted that Plaintiff was mostly stable and that her leg acts up occasionally if she over uses

it. (Tr. 151). Dr. Valaitis noted that Plaintiff would be having sinus surgery and that she should stop the Coumadin one week prior to the surgery and restart one day following the removal of the packing - Plaintiff was cleared for the surgery. (Tr. 151, 452-453). On April 1, 1997, Dr. Valaitis noted that Plaintiff was doing remarkably well and not having many problems with her leg. (Tr. 152). Plaintiff reported that she was put on Paxil by another doctor and Dr. Valaitis noted that she was having quite a bit of depression and that the Paxil seemed to help. (Tr. 152). On June 15, 1998, Plaintiff was seen for a recheck and reported more swelling and discomfort in her left leg. (Tr. 153). Dr. Valaitis noted that Plaintiff was smoking half a pack a day and that she reported she used her support stocking and tried to stay off her feet. (Tr. 153). Dr. Valaitis referred Plaintiff for a peripheral vascular evaluation with Dr. Klazura. (Tr. 153).

On June 25, 1998, Plaintiff was seen by Dr, Michael Kikta, MD. (Tr. 156-158). Dr. Kitka reported that Plaintiff had had a hysterectomy in 1980 and developed deep vein thrombosis in her left leg. (Tr. 156). Plaintiff has been on Coumadin since then has had recurrent phlebitis when taken off the Coumadin. (Tr. 156). Dr. Kikta noted no major varicosities or ulcerative/preulcerative changes. (Tr. 157). Plaintiff reported that she had not worn support stockings in the last several years and admitted that they make her legs feel better but are hot. (Tr. 158). Dr. Kikta referred Plaintiff for a venous scan and gave Plaintiff a prescription for compression stockings. (Tr. 158). A Venous scan of July 14, 1998, demonstrated severe deep venous valvular insufficiency present at all levels in the left leg from the iliac to tibial veins. (Tr. 155). On July 14, 1998, Dr. Kikta reported that Plaintiff should be able to control her disease reasonably well through the use of the stockings, though given the severity of her condition she is set up for long term problems, including ulceration. (Tr. 158). Dr. Kikta noted that it is appropriate for Plaintiff to wear her stockings and attempt to

work as long as her leg is reasonably comfortable. (Tr. 158).

Plaintiff was seen by Dr. Stephen Textor, MD, on July 30, 1998. (Tr. 183). Dr. Textor noted that Plaintiff had a normal hematocrit and blood count and acceptable laboratory studies including urine, electrocardiogram, CT of the pelvis, and chest X-ray. (Tr. 183). Doppler scan of the lower extremities demonstrated a normal right leg and reduced calf muscle pump function and venous competence at the left leg. (Tr. 183). The scan demonstrated "extensive changes of chronic venous thrombosis" and Dr. Textor indicated that management of the disorder should include external compression stockings worn thigh-high, a regular conditioning schedule, and leg elevation for fifteen to thirty minutes, twice daily. (Tr. 183). Dr. Textor also indicated that he encouraged Plaintiff to stop smoking due to its effects on the vascular structures. (Tr. 183).

An MRI of Plaintiff's neck, taken April 26, 1993, demonstrated a small disk herniation at C5-6 with slight compression of the thecal sac and mild bulging at C4-5. (Tr. 180). On May 11, 1993, Plaintiff was seen by Dr. Charles Wright, MD, a neurosurgeon, regarding her neck pain. (Tr. 181-182). Plaintiff reported to Dr. Wright that she and her husband own a cleaning business and that she does occasionally have to go out to work. (Tr. 181). Plaintiff described neck and shoulder pain with some tingling and numbness down the right arm. (Tr. 181). Dr. Wright indicated that Plaintiff was not a surgical candidate and suggested physical therapy, consisting of massage, deep heat, ultrasound, and traction, and prescribed Vicodin to address Plaintiff's pain. (Tr. 182). On May 27, 1993, in a letter to Plaintiff's family physician, Dr. Malaker, Dr. Wright indicated that Plaintiff had some relief from therapy. (Tr. 509). Plaintiff also reported that she had not been able to limit her activity and was still experiencing pain and burning down her right arm. (Tr. 509). In a letter to Dr. Valaitis on June 15, 1993, Dr. Wright requested assistance in determining what anti-inflammatory

10

medications might be appropriate for Plaintiff, given her Coumadin use, and what plan would be appropriate for an epidural steroid injection to relieve Plaintiff's cervical symptoms. (Tr. 508). A July 5, 1995, MRI of Plaintiff's cervical spine demonstrated findings similar to the April 1993 MRI. (Tr. 519). Disc bulging at C5-6 and C6-7 with slight compression of the thecal sac was noted with no large herniation noted. (Tr. 509). An MRI of the lumbosacral spine, taken on the same date indicated that Plaintiff's bony alignment was maintained, some disc dessication at L4-5, and a small disc protrusion at L1. (Tr. 519). Plaintiff was seen by Dr. Stephen Croy, MD, at Medical Pain Management Services, in Loves Park, Illinois on January 15, 1996. (Tr. 541-542). Dr. Croy noted that Plaintiff reported being involved in an automobile accident in 1972 where she sustained a forty foot fall and her husband was killed. (Tr. 541). Plaintiff reported occasional numbness in the tips of her fingers, neck, and left arm, and shoulder pain that is burning in nature and causes sleeplessness. (Tr. 541). Dr. Croy indicated that Plaintiff suffered from degenerative disc disease of the cervical spine that is stable as demonstrated by several MRI's. (Tr. 541). Dr. Croy noted that he would perform a block in four weeks and that Plaintiff was to stop the Coumadin four days prior to that date. (Tr. 542). Plaintiff was seen by Dr. Nesher Asner, MD, a neurologist, on September 8, 1998. (Tr. 543-544). Plaintiff reported a long history of neck, shoulder, and mid-back pain with numbness and tingling in both arms and hand. (Tr. 543). Dr. Asner noted that Plaintiff had pain with most motions involving her shoulders and has normal, symmetric strength in her trapezius, deltoids, biceps, triceps, grips, and finger spreads. (Tr. 543). Dr. Asner reported that Plaintiff has a chronic musculoligamentous strain and chronic pain without any objective evidence of radiculopathy or cord compression. (Tr. 544).

Treatment records from Dr. Clay Malaker, MD, indicate that he treated Plaintiff for bladder

infections, dermatitis, sore throat, sore back, depression, neck and shoulder pain, bronchitis, conjunctivitis, tennis elbow, and sinus problems from July 13, 1995, through July 2, 1999. On August 9, 1994, Dr. Malaker noting that Plaintiff was experiencing feelings of guilt and worthlessness, having difficulty sleeping, and thinking about her deceased father, prescribed Paxil for depression. (Tr. 522).

In a letter dated February 2, 1995, Dr. John Butler, wrote to Dr. Malaker regarding Plaintiff's respiratory problems. (Tr. 537). Dr. Butler indicated that Plaintiff currently smokes half a pack of cigarettes a day and had, in the past, smoked as much as two packs a day. (Tr. 537). Dr. Butler reported that Plaintiff was concerned that she has emphysema. (Tr. 537). Plaintiff reported having a chronic cough since October and several episodes of acute bronchitis. (Tr. 537). Dr. Butler also indicated that, given her family history of lung cancer, Plaintiff should strive to quit smoking completely. (Tr. 532). In June 1995, Plaintiff was seen by Dr. Frank Chmelik, an allergist at the University of Illinois College of Medicine. (Tr. 539-540). Dr. Chmelik reported that Plaintiff complained of a burning nose, sinus congestion, and headaches. (Tr. 539). Skin testing showed modest reactions to house dust mites and maple trees. (Tr. 539). Dr. Chmelik's exam revealed faint wheezing over her anterior chest and markedly abnormal pulmonary function test results. (Tr. 540). Testing done again, a week later without significant intervention, showed improved results. (Tr. 540). Dr. Chmelik recommended dust control measures and Flonase. (Tr. 540).

Plaintiff was seen by Dr. Nesher Asner, MD, a neurologist, on September 8, 1998. (Tr. 543-544). Dr. Asner noted that Dr. Malaker had referred Plaintiff and that she had failed to appear at two prior appointments. (Tr. 543). Dr. Asner's physical exam of Plaintiff revealed a lady in moderate apparent distress with pain in most motions involving her shoulders. (Tr. 543). Dr. Asner noted fine

rales in her lungs and he indicated that she is a smoker. (Tr. 543). Plaintiff was positive for localized neck pain and there was considerable tenderness of the supraspinous ligaments. (Tr. 543). Dr. Asner concluded that Plaintiff has chronic musculoligamentous strain and chronic pain without any evidence of radiculopathy or cord compression. (Tr. 544).

On August 11, 1998, Dr. George Andrews, MD, completed a Residual Functional Capacity (RFC) assessment as to Plaintiff. (Tr. 492-299). Dr. Andrews reported that Plaintiff retains the capacity to lift twenty pounds occasionally and ten pounds frequently, stand or walk for six hours in an eight hour work day (Dr. Andrews notes that walking is preferable to standing), sit for six hours in an eight hour work day, and is unlimited with regards to pushing and pulling. (Tr. 493). Dr. Andrews found that Plaintiff is able to climb, balance, stoop, kneel and crawl frequently and crouch occasionally, and has no manipulative, visual, communicative, or environmental limitations. (Tr. 494-496). Dr. Andrews stated that Plaintiff is capable of light work, with walking preferable to standing, and that Plaintiff may also sit for long periods of time, all providing she continues her Coumadin and stockings. (Tr. 497).

On September 15, 1998, Dr. Valaitis wrote a letter regarding Plaintiff's condition of behalf of Plaintiff's application for disability benefits. (Tr. 505). Dr. Valaitis reported that Plaintiff has a history of recurrent deep vein thrombosis and post phlebitis syndrome. (Tr. 505). Dr. Valaitis noted that Plaintiff's condition worsens whenever she is on her feet for a prolonged period of time and that her condition has been worsened at times by her failure to wear her support stockings. (Tr. 505). According to Dr. Valaitis, Plaintiff's post phlebitic syndrome will never resolve and will likely worsen over time. (Tr. 505). Dr. Valaitis reported that Plaintiff is unable to engage in any type of employment that requires a significant amount of standing or walking and that Plaintiff's support

stockings are, at times, exceedingly uncomfortable and that when she needs to take it off she should spend a good part of her time reclining or with her leg propped up to prevent further aggravation and venous ulceration. (Tr. 505).

## IV. STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a

14

reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F.Supp. 1377, 1384 (N.D.Ill. 1995).

## V.  FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[1] The Commissioner sequentially

---

[1]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are

determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[2] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III,

---

identical to Part 404.

[2]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age,

17

education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.    ANALYSIS

The court will proceed through the five step analysis in order. Plaintiff last met the disability insured status requirements of the Act on December 31, 1994, and therefore must establish disability on or before that date. (Tr. 11).

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had engaged in work with her husband in operating a commercial cleaning business. The ALJ determined that Plaintiff had been evasive about her activities with the business. However, the ALJ declined to determine whether Plaintiff's activities constituted substantial gainful activity because Plaintiff was found to be not otherwise disabled at a subsequent step of the analysis. (Tr. 11).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The determinations of the ALJ as to Step One of the Analysis are not challenged by either

18

party and the court finds no reason to disturb this finding.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found that the medical evidence established that Plaintiff suffers from chronic venous insufficiency with a history of recurrent deep vein thrombosis, degenerative disc disease of the cervical spine with a superimposed strain, and small airway disease. (Tr. 14).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.      Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 14).

Substantial evidence exists to support the ALJ's finding and the court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D.      Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff is able to perform some of her past relevant work. The ALJ determined that Plaintiff retains the residual functional capacity (RFC) to lift twenty pounds occasionally and ten pounds frequently, she must get off her feet every three to four hours for fifteen to twenty minutes, and cannot be exposed to concentrated pulmonary irritants. (Tr. 12, 14). The RFC determination of the ALJ is supported by substantial

evidence in the record. The medical evidence demonstrates that Plaintiff has been advised by her treating physician, Dr. Valaitis, on many occasions to wear her support stocking and avoid being on her feet for prolonged periods of time. (Tr. 148, 195, 198, and 199). Further, throughout the period of time prior to 1994, Dr. Valaitis indicated that Plaintiff could work as long as she wore her support stocking and got off her feet for fifteen to twenty minutes several times each day. (Tr. 148, 193). On October 1, 1996, Dr. Valaitis reported that Plaintiff was mostly stable and that her leg acted up only when she over-used it. (Tr. 151). As late as July of 1998, it was noted by Dr. Kitka that Plaintiff was able to control her disease reasonably well through the use of stockings. (Tr. 158). Dr. Kitka also noted that the severity of Plaintiff's condition could result in future long term problems. (Tr. 158).

As stated above, Plaintiff must demonstrate that she became disabled on or before December 31, 1994. The only evidence in the record, other than Plaintiff's testimony, that contradicts the ALJ's RFC findings is the September 15, 1998, letter of Dr. Valaitis. (Tr. 505). In that letter, Dr. Valaitis stated that Plaintiff "is unable to engage in any type of employment that does require any significant amount of standing or walking." (Tr. 505). Because Plaintiff must demonstrate that she became disabled prior to December 31, 1994, Dr. Valaitis' letter regarding her current condition is insufficient to prove that Plaintiff's limitations are greater than those found by the ALJ. Dr. Valaitis' treatment records indicate that Plaintiff was not disabled prior to the 1994 date. Dr. Valaitis reported that Plaintiff's condition was exacerbated by her failure to wear her support stockings as prescribed, avoid being on her feet for prolonged periods, and take her Coumadin regularly. In 1990, Dr. Valaitis noted that he had no objection to Plaintiff returning to work and that she should wear her support stockings. (Tr. 193). Given these treatment notes, this court finds that the ALJ's RFC determinations is supported by the record.

Plaintiff asserts that the issue is whether she is required to elevate her legs above heart level several times a day or whether "getting off her feet" is sufficient. The vocational expert, Ms. Entenberg, testified that if Plaintiff were required to elevate her legs above heart level, then no job would remain that Plaintiff would be capable of performing. (Tr. 70). Ms. Entenberg also testified that if Plaintiff were only required to elevate her legs using a stool, then Plaintiff could perform her past gate guard, gas station clerk, machine operator, and vending jobs. (Tr. 70). Plaintiff asserts that, given Dr. Valaitis' September 1998 letter, Plaintiff is clearly required to elevate her feet above heart level or recline and not just sit down periodically throughout the day as the ALJ found. (Plaintiff's Memorandum at 5, filed 2/25/2002). Plaintiff also notes that she was encouraged by Dr. Textor to elevate her legs twice daily for fifteen to thirty minutes. (Plaintiff's Memorandum at 8, filed 2/25/2002). However, this court notes that Dr. Textor's report is also from 1998 and, therefore, post-dates Plaintiff's last insured date. (Tr. 183). Further this court notes that Dr. Textor also reported that Plaintiff's work schedule should avoid prolonged periods of sitting. (Tr. 183). The implication then is that Dr. Textor does not believe that Plaintiff's condition precludes her from being able to work. (Tr. 183). It may be that Plaintiff is now required to elevate her legs several times a day. However, the evidence does not demonstrate that that was the case prior to December 31, 1994. The medical evidence indicates that on those occasions when Plaintiff's condition worsened as a result of her not following her treating physician's advice, she was then advised to elevate her legs and recline in bed to reduce the resultant swelling. Generally, however, Dr. Valaitis indicated that should get off her feet for fifteen to twenty minutes every three to four hours and wear her support stockings. (Tr. 149, 193, and 198). Therefore, Plaintiff has failed to demonstrate that she became disabled due to chronic venous insufficiency prior to her last insured date.

21

Substantial evidence exists to support the ALJ's finding and the court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Four of the Analysis is affirmed.

E.      Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

The ALJ did not proceed to Step Five as she determined at Step Four that Plaintiff is not disabled.

VII.    **CONCLUSION**

For the reasons stated above, this court finds that the ALJ's findings at each step of the sequential analysis are supported by substantial evidence. Therefore, Plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is granted.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 7/12/02

22